**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 17-cv-1276-WJM-MEH

ESTATE OF JAMES STRONG, JR.
LANHISHA RICHMOND, individually and as natural parent of minors J.S. and T.S.R.,
MARCUS STRONG, and
HOWARD MITCHELL, JR.,

    Plaintiffs,

v.

CITY OF NORTHGLENN, COLORADO,
CITY OF THORNTON, COLORADO,
CITY OF WESTMINSTER, COLORADO,
NICHOLAS WILSON,
JASON SCHLENKER, and
ADAM NIELSEN,

    Defendants.

## ORDER GRANTING DEFENDANTS' PARTIAL MOTION TO DISMISS

In this civil rights action arising from the fatal shooting of James Strong, Jr. by police, Mr. Strong's Estate (the "Estate"), and Plaintiffs Lanhisha Richmond ("Richmond"), individually and as the parent of minors J.S. and T.S.R., Marcus Strong, and Howard Mitchell, Jr., bring constitutional, statutory and tort claims arising out of alleged excessive use of force, against police officers Nicholas Wilson, Jason Schlenker, and Adam Nielsen, and their employers, the Colorado cities of Northglenn , Thornton, and Westminster (together, the "Cities" or "Municipal Defendants"). Now before the Court is Defendants' Partial Motion to Dismiss (ECF No. 35 (Defendants' "Motion")), which seeks dismissal under Federal Rule of Procedure 12(b)(6) of the

claims pled against the Cities and Defendant Nielsen. For the reasons explained below, the Motion is granted.

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." The 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

However, "[t]he burden is on the plaintiff to frame a complaint 'with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

"[C]omplaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' . . . 'will not do.'" *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 555).

## II. BACKGROUND

The following factual background is drawn from Plaintiffs' Amended Complaint (ECF No. 33 (the "Complaint")), and treated as true for present purposes. *See Ridge at Red Hawk*, 493 F.3d at 1177.

On May 28, 2015, Plaintiff Lanhisha Richmond ("Richmond") and her common-law husband, James Strong, Jr. ("Strong"), were asleep in their home in Northglenn, Colorado, when they were awoken by a loud sound, followed by more loud noises coming from the living room area. (ECF No. 33 ¶¶ 5–6, 18–19.) Also in the home with Strong and Richmond were their minor child, J.S., Richmond's other child, T.S.R., Strong's brother, Marcus Strong, and a visiting friend, Howard Mitchell, Jr., all of whom are Plaintiffs here. (*Id.* ¶¶ 7–10, 18.)

The noise turned out be police officers, including Defendants Nicholas Wilson ("Wilson"), who is an officer with Northglenn Police Department, and Defendant Jason Schlenker ("Schlenker"), who is an officer with the Thornton Police Department. (*See id.* ¶¶ 15–16, 20, 25, 31.) Both Wilson and Schlenker were assigned to the North Metro Task Force (the "Task Force") and the Northglenn/Thornton SWAT Team. (*Id.* ¶¶ 15–16.)[1]

---

[1] The Complaint pleads that, "[a]t all relevant times," each of the Cities "maintained, operated, or otherwise contributed to a special weapons and tactics (S.W.A.T.) unit known as the Northglenn/Thornton SWAT team as well as the North Metro Task Force." (ECF No. 33 ¶¶ 87, 105, 123.) Defendants contend that the Task Force "is distinct from the

More specifically, unbeknownst to any occupants of the home, "the police had detonated a flash-bang grenade outside the home and used a battering ram to knock the front door from its hinges." (*Id.* ¶ 20.) The police (*i.e.*, "members of the North Metro Task Force") were "acting on a no knock warrant," which "had been issued nine days earlier on May 19, 2015 to lead investigator [Defendant] Adam Nielsen" (*id.* ¶ 40), whom Plaintiffs allege "was a law enforcement officer and served as the detective for the North Metro Task Force" (*id.* ¶ 17). In addition, Plaintiffs allege that "[d]uring the period between the issuance of the warrant [on May 19, 2015] and the execution of the warrant [on May 28, 2015], a significant change in circumstances had occurred: school had ended . . . on May 28, 2015." (*Id.* ¶ 40.)

When the SWAT Team entered the home, however, "[a]t no time" did Strong or Richmond "hear the intruders identify themselves as law enforcement." (*Id.* ¶ 23.) Likewise, the other occupants of the house "never heard the men identify themselves as law enforcement." (*Id.* ¶ 24.) The "intruders" also "were wearing dark pants, dark long sleeve shirts, masks, and military style boots." (*Id.* ¶ 43.)

Fearing for his and his family's safety, Strong picked up a gun (which was registered to his wife), and "stood behind the door with the gun pointed upward." (*Id.* ¶¶ 21–22.) Strong and Richmond heard footsteps moving closer to their bedroom, and when the "intruders" began to enter the bedroom, Strong fired two shots. (*Id.*

---

Northglenn/Thornton SWAT team of which Wilson and Schlenker were members," and that Plaintiffs' Complaint incorrectly alleges that Wilson and Schlenker were members of the [Task Force]." (ECF No. 37 at 7 n.1.) Defendants acknowledge, however, that the Court treats Plaintiffs' factual allegations as true for purposes of Rule 12(b)(6). In any event, these allegedly incorrect organizational facts do not alter the Court's present analysis. (*See id.*)

4

¶¶ 23, 25.) The person entering the bedroom turned out to be Officer Wilson, who fired his weapon at Strong. (*Id.* ¶¶ 25–26.) Strong was injured and fell to the floor; as he fell, his gun fired a third shot. (*Id.* ¶ 26.) Wilson continued firing at Strong, "through the bedroom wall as he retreated down the hall," entering the bedroom of Strong and Richmond's child, J.S. (*Id.* ¶¶ 27–28.) Richmond remained in hers and Strong's bedroom, as did Strong, who lay motionless on the floor. (*Id*. ¶ 29.)

Schlenker then entered the bedroom, pointing a gun at Strong. (*Id.* ¶ 31.) As Strong "lay severely injured on the ground," Schlenker "began to shoot Strong repeatedly with a .233 caliber rifle which was equipped with a silencer." (*Id.*) Schlenker began "firing at a distance of eight feet and progressed until he stood over [Strong's] prone body." (*Id.* ¶ 32.) Richmond was "yelling at the [*sic*] Schlenker to stop shooting," but Schlenker continued to shoot and move closer to Strong, who "was in a fetal position on the floor and not resisting." (*Id.* ¶¶ 34–35.) Schlenker then—according to the Complaint—stood over Strong and "shot [Strong] in his head from a distance of ten inches." (*Id.* ¶ 35.)

Strong "was shot twenty times, including six shots to the head and neck area," and died from the resulting severe injuries. (*See id.* ¶¶ 33, 36, 38, 44.)[2] Plaintiffs also allege that "numerous shots were directed through walls where no target acquisition was possible," and that "the projectiles penetrated . . . to the floor below and struck . . . a sofa where TSR . . . was asleep." (*Id.* ¶ 39.) Afterwards, each of the three adults in

---

[2] The Complaint is somewhat ambiguous on the exact number of times Strong was shot, at one point pleading Strong "was riddled with *over* 20 bullet wounds," and elsewhere pleading he "was shot twenty times." (*Id.* ¶¶ 38, 44 (emphasis added).)

the residence was handcuffed and jailed, and Richmond's children were "placed in state custody."  (*Id*. ¶ 45.)

This lawsuit followed.  Plaintiffs filed a first Complaint on May 25, 2017 (ECF No. 1), and an Amended Complaint on August 15, 2017 (ECF No. 33).  The Amended Complaint pleads nine claims: claims for excessive force brought by the Estate against Wilson and Schlenker (Claims 1 & 2); a claim by the Estate against Nielsen for Failure to Intervene (Claim 3); claims for municipal liability brought by the Estate against each of Northglenn, Thornton, and Westminster (Claims 4–6); and three separate claims against Wilson and Schlenker for false arrest, brought respectively by Richmond, on behalf of herself and her children (Claim 7), by Defendant Marcus Strong (Claim 8), and by Defendant Howard Mitchell, Jr. (Claim 9).

## III.  ANALYSIS

### A.  Failure-to-Intervene Claim Against Nielsen

Defendant Nielsen moves to dismiss Count 3 of Plaintiffs' Complaint, which alleges Nielsen violated Strong's rights by failing to intervene to halt the use of force by Wilson and Schlenker.  (ECF No. 33 ¶¶ 73–85.)

The Complaint alleges that Wilson and Schlenker used excessive force in violation of the Constitution (*id.* ¶ 74), that Nielsen "was the detective in charge of the North Metro Task Force" (*id.* ¶ 77), that he "had knowledge that the . . . conduct of [Wilson and Schlenker] constituted unreasonably excessive force," and "knowledge that [Strong's] constitutional rights were being violated," and that Nielsen "had a realistic opportunity to intervene and prevent the deprivation of [Strong's] constitutional rights"

6

(*id.* ¶¶ 79–81).

Defendants argue Nielsen cannot be held liable absent plausible allegations that he had personal involvement in the alleged constitutional violation. Further, given no allegation that Nielsen was present in Plaintiffs' home at the time of the shooting, Defendants argue the Complaint "fails to allege that Nielsen observed the use of force by either Wilson or Schlenker and had a sufficient opportunity to intervene." (ECF No. 35 at 12–13.)

    1.    <u>Failure-to-Intervene Liability</u>

Generally speaking, "a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983." *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996) (citing *Lusby v. T.G. & T. Stores, Inc.*, 749 F.2d 1423, 1433 (10th Cir. 1984)). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official." *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Id.*; *accord Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). Typically, "[w]hether an officer had sufficient time to intercede or was capable of preventing the harm . . . is an issue of fact

7

for the jury." *Id.* Here, however, even treating the facts pled in the Complaint as true, it does not plausibly allege that Nielsen knew excessive force was being used or had a realistic opportunity to stop it.

Plaintiffs concede that Nielsen "was not present at the scene," and advance no argument as to how he could have realistically intervened to halt Wilson and Schlenker's allegedly excessive use of force at the time it occurred. (*See* ECF No. 36 at 10.) Rather, Plaintiffs argue that Nielsen "had clear knowledge of potential unlawful conduct," before the incident, that he "was the detective in charge of the North Metro Task Force," and that the warrant for Strong's home was issued to Nielsen. (ECF No. 33 ¶¶ 40, 77.) Beyond that, the Complaint includes the conclusory allegation that Nielsen "had knowledge that the . . . conduct . . . constituted unreasonably excessive force." (*Id.* ¶ 79.) But there is not even a passing allegation, for instance, that Nielsen was involved in organizing or planning the entry into Strong's home, choosing what tactics would be used, or had any reason to know what Wilson and Schlenker's conduct would be until after the fact. There is simply no plausible factual support for Plaintiffs' conclusory assertion that Nielsen "had a realistic opportunity to intervene" (*Id.* ¶ 81), which is no more than a "formulaic recitation." Such conclusory pleading is insufficient. *Twombly*, 550 U.S. at 555, 556; *Robbins*, 519 F.3d at 1247.

Plaintiffs' attempts to defeat Defendants' Motion are unpersuasive, mostly amounting to *post hoc* efforts recast their claim, or arguments that are unsupported by the skeletal nature of their Complaint. Plaintiffs argue that Nielsen had "clear knowledge of potential unlawful conduct and nine days to intervene before the incident

occurred." (ECF No. 36 at 10.) But the Complaint fails to allege any facts plausibly showing that Nielsen had any prior knowledge of how Wilson and Schlenker would act or any opportunity, either before or during their conduct, to prevent it. Moreover, Plaintiffs cite no authority supporting a failure-to-intervene theory of liability where the facts show the defendant was not present at the scene. Even Plaintiffs' own characterization of the applicable case law reflects "cases . . . . where [d]efendants were *present* and *witnessed* excessive force." (ECF No. 36 at 10 (emphasis added).) Nielsen was neither present nor a witness to the alleged use of excessive force, and none of the cited failure-to-intervene cases arose on analogous facts or supports the claim that he had a realistic opportunity to intervene in the circumstances alleged here.[3]

2. <u>Supervisory Liability</u>

Plaintiffs also attempt to recast their failure-to-intervene claim as a claim of supervisory liability, or more specifically, "fail[ure] to intervene as a supervisor by issuing a baseless warrant and allowing that warrant to proceed as is." (ECF No. 36 at 10.) Plaintiffs' evasion on this point only tends to confirm that the claim they did plead is insufficient.

Initially, no supervisory liability claim was included in the Complaint. While potentially viable, such claims are distinct from failure-to-intervene claims, requiring an

---

[3] *See Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) ("In order to be liable for failure to intervene, the officers must have observed or had reason to know of a constitutional violation and have had a realistic opportunity to intervene."); *Booker,* 745 F.3d at 422 ("all of the Defendants were present and observed the entire use of force"); *Vondrak*, 535 F.3d at 1210 (noting defendant's "close proximity to the initial handcuffing," and his "presence immediately thereafter"); *Fogarty*, 523 F.3d at 1164 (defendant "supervised the arrest," "was present when the group of line officers were dispatched," and was "present for the arrest"); *Mick*, 76 F.3d at 1136–37 (plaintiff's evidence could support finding defendant was present on the scene, "observed the interaction," and "failed to intervene," thus defeating summary judgment).

9

'affirmative link' between the supervisor and the constitutional violation," meaning "'more than a supervisor's mere knowledge of his subordinate's conduct.'" *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (quoting *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013)).

"[A] plaintiff must satisfy three elements to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities: (1) personal involvement; (2) causation; and (3) state of mind." *Booker*, 745 F.3d at 435 (internal quotation marks omitted). In particular, the second element "requires the plaintiff to show that the defendant's alleged action(s) caused the constitutional violation by setting in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Id.*

Even if Plaintiffs had included this claim in their Complaint, they have not pled plausible factual matter to support it. Setting aside the question of whether identifying Nielsen as a "lead investigator" and "detective in charge" is equivalent to pleading he was Wilson and Schlenker's "supervisor," no facts in the Complaint show he was personally involved in executing the warrant or in planning the entry into Plaintiffs' home. Nor are there any non-conclusory allegations pleading the causation or state-of-mind elements of such a claim. Despite their present arguments, nothing in the Complaint supports Plaintiffs' claim that Nielsen "was aware the warrant was baseless," that he knew it "would be executed while children would be in the home," or that he "allowed it to proceed." (ECF No. 36 at 12.)

Absent any supporting factual allegations in the Complaint, Plaintiffs' argument makes clear they are seeking to hold Nielsen liable simply because he allegedly held a

"lead" or "in charge" role within the Task Force. This attempt is foreclosed by the well-established rule that "[i]ndividual liability under § 1983 must be based on the defendant's personal involvement in the alleged constitutional violation," and that "[§] 1983 does not authorize liability under a theory of *respondeat superior*." *Schneider*, 717 F.3d at 767, 768 (internal quotation marks omitted; certain alterations incorporated).

* * *

In sum, because Plaintiffs neither included a supervisory liability claim in their Complaint, nor pled facts to support one, and because the failure-to-intervene claim is at best conclusory, lacking plausible factual support, "Count 3" of the Complaint (ECF No. 33 ¶¶ 73–85), brought by the Estate against Defendant Nielsen for failure-to-intervene, is dismissed under Rule 12(b)(6) for failure to state a claim.[4] Because the Court can perceive no way in which amendment could cure the defects in Plaintiffs' failure-to-intervene claim, the dismissal is with prejudice.

**B.     Municipal Liability**

The Cities argue that Claims 4, 5, and 6, pleading municipal liability against each of the three Cities, must be dismissed under Rule 12(b)(6) for failure to state a claim.

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality can be liable under 42 U.S.C. § 1983 for damages only when the entity's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may

---

[4] Defendants' Motion seeks to dismiss this claim based on qualified immunity. Because the Complaint does not plausibly plead any constitutional violation committed by Nielsen, further qualified immunity analysis is unnecessary. *See generally Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

fairly be said to represent official policy, inflicts the [constitutional] injury." 436 U.S. at 694. "A plaintiff suing a municipality under Section 1983 for the acts of one of its employees must prove: (1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 667 (10th Cir. 2010) (internal quotation marks omitted); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 477 (1986) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." (quoting *Monell*, 436 U.S. at 691)).

At the outset, Defendants argue that these claims are insufficiently pled on the whole, because they merely recite "a laundry list of the elements of a *Monell* cause of action," offering only "formulaic recitations" of the elements of these claims." (ECF No. 35 at 6, 7.) The Court agrees, but addresses each of Plaintiffs' theories of municipal liability in turn.

    1.    <u>Westminster</u>

Plaintiffs' claim against Westminster fails under the first requirement of *Monell*, because Plaintiffs have not pled that any employee of Westminster, including Nielsen, acted to violate Plaintiffs' constitutional rights.

Initially, the Complaint fails to identify *any* person as being an employee of Westminster, including Nielsen. (See ECF No. 33 ¶ 17.) Rather, the Complaint alleges Westminster's involvement only by way of the Task Force, alleging that Westminster is one of the cities "responsible for the hiring, training, supervising, and disciplining of

agents, employees, and police officers in the North Metro Task Force," which Plaintiffs characterize as "a multi-jurisdictional governmental entity . . . . made up of officers from eight cities and counties," including Westminster. (*Id.* ¶ 14.) As to Nielsen, the Complaint states only that he "was a law enforcement officer and . . . detective for the . . . Task Force," without identifying his employer. As a simple pleadings matter, this defeats any *Monell* claim against Westminster. (*Id.* ¶ 17.) *Cavanaugh*, 625 F.3d at 667.

Moreover, while Defendants acknowledge that Defendant Nielsen is, in fact, an employee of Westminster (a fact nowhere pled in the Complaint), the Court has determined above that Plaintiffs have not pled facts to show that he committed any constitutional violation. Plaintiffs' *Monell* claim against Westminster as Nielsen's employer therefore must also fail.

2. <u>Northglenn and Thornton</u>

As to Northglenn (Wilson's employer) and Thornton (Schlenker's employer), Plaintiffs allege, albeit in conclusory fashion, two arguably distinct theories of *Monell* liability, which the Court will address in turn.

a. *Failure to Train*

First, Plaintiffs allege each of the Cities "failed to properly train members of [the] Task Force," including Wilson and Schlenker, both "on the use of excessive force" and also "on the execution of no-knock warrants." (ECF No. 33 ¶¶ 91–92, 109–10, 127–28.) A failure-to-train theory of § 1983 municipal liability for use of excessive force is viable under *Monell* and *City of Canton v. Harris*, 489 U.S. 378 (1989). However,

13

> [i]n order to prevail on a claim against a municipality for failure to train its police officers in the use of force, a plaintiff must first prove the training was in fact inadequate, and then satisfy the following requirements:
>
>> (1) the officers exceeded constitutional limitations on the use of force;
>>
>> (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal;
>>
>> (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact; and
>>
>> (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000) (quoting *Allen v. Muskogee*, 119 F.3d 837, 841–42 (10th Cir. 1997)); *see also City of Canton*, 489 U.S. at 389–91; *Zuchel v. City & Cnty. of Denver, Colo.*, 997 F.2d 730, 734–35 (10th Cir. 1993).

The Court agrees with Defendants that Plaintiffs' Complaint fails to plead sufficient facts to make out a viable failure-to-train claim. The Complaint's relevant allegations include *only* the perfunctory language already quoted above, repeating the same verbatim, conclusory legal claims as to each of the three Cities. (ECF No. 33 ¶¶ 91–92, 109–10, 127–28.) This amounts to no more than an insufficient "formulaic recitation" of the elements of a claim. *Twombly*, 555 U.S. at 555. The Complaint includes no plausible factual material substantiating a failure-to-train claim. There are *no* factual allegations regarding what training was provided, *no* factual allegations as to how it was allegedly deficient, and *no* allegations regarding the training (or lack thereof) provided specifically by any one of the three municipal Defendants. The pleading

14

requirements applicable under *Twombly*, *Iqbal*, and *Robbins* make Plaintiffs' wholly conclusory claims insufficient.

Also, and more specifically, Plaintiffs have not adequately pled facts that could show that the allegedly inadequate training demonstrates "deliberate indifference" by any of the Cities towards Plaintiffs or other persons with whom the Task Force or other police come in contact. "[O]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a policy—can a city be liable for [a failure to train] under § 1983." *Myers v. Oklahoma Cnty Bd. of Cnty. Comm'rs* 151 F.3d 1313, 1318 (10th Cir. 1998) (quoting *City of Canton*, 489 U.S. at 389).

> Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.' A less stringent standard of fault for a failure-to-train claim would result in *de facto respondeat superior* liability on municipalities[.]

*Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (quoting *City of Canton*, 489 U.S. at 395 (O'Connor, J., concurring/dissenting)); other citations omitted; alterations incorporated).

While Plaintiffs' Complaint recites in conclusory fashion that each of the Cities "was deliberately indifferent and reckless with respect to the potential violation of constitutional rights" (ECF No. 33 ¶¶ 94, 112, 130), it again does so without including any plausible factual matter supporting this conclusion. For instance, while "[a] pattern

15

of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train," *Connick*, 563 U.S. at 62, Plaintiffs have not alleged *any* prior instances of similar conduct, or any other facts which might establish that the municipalities were aware of, but disregarded, a problem in their training programs.

In opposing Defendants' Motion, Plaintiffs attempt to rely on *Pembaur*, 475 U.S. at 480, for the proposition that "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official policy for purposes of § 1983." (ECF No. 36 at 6.) But "[w]here a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show that the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued." *Hollingsworth v. Hill*, 110 F.3d 733, 743 (10th Cir. 1997). Plaintiffs have not made any plausible allegation that Wilson and Schlenker's actions, or the allegedly deficient (but unidentified) training, were directed by any "final policymaker," reflecting "a deliberate choice to follow a course of action from among various alternatives," as required under *Pembaur*. *See, e.g., Thomas v. City of Snyder, Okla.*, 103 F.3d 145 (10th Cir. 1996) (table), 1996 WL 662453, at *5–6 ("[T]he key inquiry in determining whether municipal liability attaches to an official's actions is whether that official has the policymaking authority necessary to make his acts those of the municipality. * * * 'If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat*

*superior* liability.'" (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988))).

As a result, Plaintiffs' failure-to-train theory must fail. Plaintiffs' Response argues that the allegedly egregious nature of the constitutional violation makes it "patently obvious" that Wilson and Schlenker had inadequate training, highlighting the claims that children were in the home and that shots were fired through walls, and the allegation that Strong was shot brutally and repeatedly as he lay on the floor, in what Plaintiffs characterize as an "execution." (*See* ECF No. 36 at 8–9; ECF No. 33 ¶ 37.) But even treating these factual claims as true, and even as deeply disturbing as are the allegations that Strong was for all practical purposes executed by Schenkler as Strong lay seriously wounded and not resisting on the floor, the Complaint fails to include any factual allegations that this incident was in fact the product of a training deficiency rather than individual misconduct, or that any of the Cities were aware of such allegedly deficient training but deliberately indifferent to its consequences.

b. *"Condoned or Fostered" Claim*

The Complaint also alleges, again summarily, that each of the Cities "had in effect official policies or longstanding practices and customs that condoned and fostered the unconstitutional conduct of [Wilson, Schlenker, and Nielsen] and other members of the North Metro Task Force." (*Id.* ¶¶ 90, 108, 126.) Plaintiffs also allege each of the Cities "had actual and/or constructive knowledge of the deficient policies, practices and customs alleged," and despite such knowledge, "condoned, tolerated and through its own actions or inactions thereby ratified such policies." (*Id.* ¶¶ 93, 111, 129.)

Again, the Complaint fails to support these conclusory pleadings with any

17

plausible factual allegations to support a *Monell* claim. Other than by saying it is so, the Complaint does not identify *any* policy, practice, or custom, or any facts tending to show one existed. Without belaboring the point, the Court agrees with Defendants that the Complaint again does no more than to plead "labels and conclusions" and "a formulaic recitation" of a *Monell* claim, lacking plausible "factual matter" to support these claims. Under *Twombly* and its progeny, this "will not do" and Plaintiffs' *Monell* claims must be dismissed. *See Robbins*, 519 F.3d at 1247.[5] However, since the fatal defect with these claims is primarily a fault of omission (namely, the total absence of plausible "factual matter" alleging a municipal policy, practice or custom as the "moving force" behind a constitutional violation), and this omission could conceivably be cured by amendment, dismissal will be without prejudice.

## IV. CONCLUSION

For the reasons stated above, the Court ORDERS as follows:

1. Defendants' Partial Motion to Dismiss (ECF No. 35) is GRANTED as follows:

    a. "Count 3" of Plaintiffs' Amended Complaint (ECF No. 33 ¶¶ 73–85), brought by the Estate against Defendant Nielsen for failure-to-intervene, is DISMISSED WITH PREJUDICE;

    b. Each of "Count 4," "Count 5," and "Count 6" of Plaintiffs' Amended Complaint (ECF No. 33 ¶¶ 86–139), brought by the Estate against the Cities of Northglenn, Thornton, and Westminster, respectively, is

---

[5] Plaintiffs' *Monell* allegations are verbatim as to each of the three Cities, including Westminster. Thus, for the same reasons applicable to Northglenn and Thornton, Plaintiffs' *Monell* claim against Westminster would fail even if Plaintiffs had a viable claim of a constitutional violation committed by Nielsen or another Westminster employee.

DISMISSED WITHOUT PREJUDICE;

2. Notwithstanding any provision in the Scheduling Order that might direct a different result, Plaintiffs are GRANTED leave to file a motion for leave to file a second amended complaint no later than **May 31, 2018** (*i.e.*, simultaneously with the discovery cutoff deadline, as currently extended (*see* ECF No. 52)).

Dated this 5th day of April, 2018.

BY THE COURT:

William J. Martínez
United States District Judge